FOR PUBLICATION

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

EDELMINO ACOSTA, JR., OLIVER A.　　　)
MONTOYA and HUMBERTO FIGUEROA,　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)　　Civil Action No. 2008-089
HOVENSA, LLC, THE UNITED　　　　　　)
STEELWORKERS OF AMERICA and THE　)
UNITED STEELWORKERS OF AMERICA,　)
LOCAL CHAPTER 8526,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　　　　　)
_____)

**Attorneys:**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
　　　　*For the Plaintiffs*

**Linda J. Blair, Esq.,**
St. Croix, U.S.V.I.
　　　　*For the Defendant HOVENSA, LLC*

**Michael J. Sanford, Esq.,**
St. Croix, U.S.V.I.
　　　　*For the Defendant United Steelworkers of America and the*
　　　　*Defendant United Steelworkers of America, Local Chapter 8526*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER is before the Court on Defendant HOVENSA's Motion for Summary

Judgment (Dkt. No. 116), and Defendants United Steelworkers of America and United

Steelworkers of America, Local Chapter 8526's ("Union Defendants") Motion for Summary

Judgment (Dkt. No. 118), which were filed on March 30, 2012.[1]  In this "hybrid" section 301 action brought under the Labor Management Relations Act, 29 U.S.C. §§ 159 and 185, Plaintiffs claim that their employer, HOVENSA, breached their Collective Bargaining Agreement when it promoted two allegedly less senior employees over them.  Plaintiffs also claim that the Union Defendants violated their duty of fair representation when they refused to pursue grievances against HOVENSA regarding these promotions.  To proceed to trial on their "hybrid" section 301 cause of action, Plaintiffs must survive summary judgment on *both* their breach of contract and breach of the duty of fair representation claims.  As discussed more fully below, because the Court concludes that there is no genuine issue of material fact on Plaintiffs' breach of the duty of fair representation claim, the Court will grant Defendants' Motions for Summary Judgment.

## I.   <u>BACKGROUND</u>

### A.  Plaintiffs

Plaintiffs Edelmino Acosta, Jr., Oliver Montoya, and Humberto Figueroa ("Plaintiffs") are hourly employees of Defendant HOVENSA, who work in the "Process Division," and are classified as "Process Operators."  (Union Defs.' Statement of Facts ("UDSOF") at ¶¶ 3 & 5, Dkt. No. 119; Plts.' Response to Union Defs.' SOF ("PRUDSOF") at ¶¶ 3 & 5, Dkt. No. 145).  Plaintiffs are members of the bargaining unit represented by Defendant United Steelworkers of America.  (UDSOF at ¶ 3; PRUDSOF at ¶ 3).  The relationship between Defendant HOVENSA and the Union Defendants is governed by a collective bargaining agreement ("CBA").

---

[1]   The Court exercised its discretion to grant Plaintiffs two extensions of time within which to respond to Defendants' Motions for Summary Judgment, notwithstanding their submission of untimely and unsupported motions for extensions that failed to establish the requisite excusable neglect and good cause.  (*See* Dkt. Nos. 121 and 141).  Accordingly, on May 21, 2012, Plaintiffs filed their responses to Defendants' Motions for Summary Judgment. (Dkt. Nos. 142 and 144). The Union Defendants and HOVENSA filed their reply briefs on June 4, 2012 (Dkt. No. 153), and June 7, 2012, (Dkt. No. 154), respectively.

(HOVENSA's SOF ("HSOF") at ¶ 1, Dkt. No. 117; Plts.' Response to HOVENSA's SOF ("PRHSOF") at ¶ 1, Dkt. No. 143; UDSOF ¶ 4; PRUDSOF ¶ 4; *see also* CBA, Dkt. No. 145-1). The CBA at issue in this case was in effect from March 7, 2007 through February 29, 2011. (UDSOF ¶ 4; PRUDSOF ¶ 4).

The CBA classifies HOVENSA's work force into several levels, including "C" Operators "B" Operators and "A" Operators, with "C" as the lowest and "A" as the highest. (HSOF at ¶ 2; PRHSOF at ¶ 2; UDSOF at ¶ 7; PRUDSOF at ¶ 7). On March 19, 2007, Plaintiffs were awarded "B" Operator positions. (HSOF at ¶ 12; PRHSOF at ¶ 12). Plaintiffs assert that they were certified and began working as "B" Operators in September 2007. (PRUDSOF at ¶ 19).

### B.  The 2006 "B" Operator Promotions of Williams and Freeman

According to the CBA, when a permanent vacancy occurs in a non-entry level job classification, HOVENSA is required to post a notice of the job opening ("Bid Notice") for a period of ten calendar days. (CBA § 16.3). Employees who are in the next lower job classification of the vacancy may "bid" for that position within the ten day period. *Id*. For example, if an "A" Operator position is posted by HOVENSA, "B" Operators are permitted to "bid" for that position.

On July 24, 2006, HOVENSA posted a Bid Notice, designated "06-24," for two Process "B" Operator positions in the "West Powerhouse." (HSOF at ¶ 11; PRHSOF at ¶ 11; *see also* "06-24" Bid Notice, Dkt. No. 115-6 at 1). Eleven HOVENSA employees, including Peter Williams and Eugene Freeman, applied for the positions. (HSOF at ¶ 11; PRHSOF at ¶ 11; Williams Dep. at 31-34, Dkt. No. 145-3). On September 13, 2006, HOVENSA awarded one of the positions to Peter Williams. (UDSOF at ¶ 16; PRUDSOF at ¶ 16; Williams Bid Award, Dkt. No. 115-6 at 2). HOVENSA posted another bid award, dated September 26, 2006, indicating

3

that Eugene Freeman had been selected for the other "06-24" "B" Operator position. (UDSOF at ¶ 17; PRUDSOF at ¶ 17; Freeman Bid Award, Dkt. No. 115-6 at 3; Williams Dep. at 36, Dkt. No. 145-3).[2]

Following the awarding of the bid, Williams never went to work as a "B" Operator in the West Powerhouse. (Williams Dep. at 41, Dkt. No. 145-3). He was never instructed by HOVENSA personnel that it was time to begin a 90-day training period for the "B" Operator position. *Id*. at 42. However, after being awarded the bid, Williams inquired of Union and HOVENSA personnel about his "B" Operator training, including Cyril Moses, the Superintendent of East Power; Andy Cornett, the Manager of Power and Utilities; Brian Dore, a HOVENSA Human Resources employee; and a Union Representative—either Union President Jackson or Union Steward Calvin Yorke. *Id*. at 42-49. In his conversation with the Union Representative, Williams asked whether he would "lose seniority . . . since [he] [hasn't] been trained as yet." *Id*. at 49. He was informed that as long as he did not "refuse" the bid, his seniority would be intact, and that if he wanted to "refuse" a bid, he would "ha[ve] to put it in writing." *Id*. When asked why he never communicated in writing to HOVENSA his concern about not being trained for the "B" Operator position, he replied: "After I get certified, I'll get backpay, so it never bothered me." *Id*. at 51.[3]

Cyril Moses testified that Williams "came to [him] one time, and he told me that he won a bid for the B for the west, but he would prefer to stay in the east. And I told him, well, once he won the bid, he has to honor the bid, or he could say he doesn't want the bid." (Moses Dep. at

---

[2]    Gerard Jackson, the Union President, testified that Freeman was classified as a "B" Operator as of October 2, 2006. (*See* Jackson Dep. at 104, Dkt. No. 143-2).

[3]    After receiving an "A" Operator bid award in May 2008 and being certified for the position, Williams received a check that he believes was backpay for his 2006 "B" Operator bid award. (Williams Dep. at 67, Dkt. No. 145-3).

12, Dkt. No. 145-6).  Moses further testified that Williams "never told me that he won't go to the west [powerhouse]," and that it was up to Tang Yuk, who was "in charge of the west," to request that Williams be released to go for his training.  *Id*. at 13, 18-19. Union President Jackson testified that a few months after Williams had been awarded the bid, he learned from Calvin Yorke that the period for Williams' certification had been extended because Williams was doing "special assignments" in the Utilities and Power section, including the training of other Operators.  (Jackson Dep. at 90-91, Dkt. No. 143-2).

### C.  The 2008 Bid Awards

On March 14, 2008, HOVENSA posted a Bid Notice for five Process "A" Operator positions.  (HSOF at ¶ 4; PRHSOF at ¶ 4; *see also* March 14, 2008 Bid Notice, Dkt. No. 115-2 at 4).  Nine individuals applied, including the three plaintiffs, Freeman, and Williams.  (HSOF at ¶ 4; PRHSOF at ¶ 4).  On or about May 19, 2008, HOVENSA awarded the positions to Williams, Freeman, and three other employees, none of which were the Plaintiffs.  (HSOF at ¶ 5; PRHSOF at ¶ 5).[4]

In June and July 2008, Plaintiffs approached the Union Steward, Carlos Figueroa, and the Assistant Manager in the East Power Utilities, Urban Paul, about their concerns with Williams' and Freeman's May 2008 "A" Operator bid awards.  The basis for their complaint was two-fold: First, they claimed that Williams had never been certified as a "B" Operator prior to being

---

[4]       After posting the Bid Notice for the five "A" Operator positions, HOVENSA initially awarded only three of the positions. (UDSOF at ¶ 11; PRUDSOF at  ¶ 11).  The Local Union then filed a grievance with HOVENSA, claiming that because five bids were posted, five positions should have been awarded.  (Jackson Dep. at 61-63, 71-73, Dkt. No. 143-2; Grievance Report, Dkt. No. 115-2 at 6).  The Local Union and HOVENSA then entered into an agreement whereby HOVENSA agreed to award two more "A" Operator bids—to Williams and Freeman— who, according to HOVENSA's seniority list, were the next most senior employees from among those who bid for the "A" Operator positions.  (Dkt. Nos. 115-2 at 3, 7).

awarded the "A" Operator bid in May 2008, while they had been certified as "B" Operators in 2007; and second, they claimed that although Freeman was awarded a "B" Operator bid in October 2006, he should not be treated as "senior" to them because the bid that he was awarded had not been posted in accordance with the CBA.  (*See* H. Figueroa Dep. at 38-40, Dkt. No. 119-9; Acosta Dep. at 37-42, Dkt. No. 145-2; C. Figueroa Dep. at 17-19, Dkt. No. 145-8; Paul Dep. at 42, 45, Dkt. No. 143-6). Carlos Figueroa informed them that he had contacted Union President Jackson, who "told him that there was no breach of contract, and there was no reason to file a grievance."  (Acosta Dep. at 40, Dkt. No. 145-2).

Plaintiffs also brought their complaint about Williams to Union President Jackson. (Acosta Dep. at 45-46, Dkt. No. 145-2; C. Figueroa Dep. at 19-20, Dkt. No. 145-8).  Jackson, who has been president of the Local Union since 1991, informed them that the promotion of Williams was in accordance with the terms of the CBA, and accordingly, there was no breach of the CBA.  (Acosta Dep. at 47-49, Dkt. No. 145-2; Jackson Dep. at 18-19, 58, Dkt. No. 143-2).[5] The Union Defendants did not further "investigate" the allegations raised by Plaintiffs, or file a grievance with HOVENSA on behalf of the Plaintiffs.  (UDSOF at ¶ 25; PRUDSOF at ¶ 25; Jackson Dep. at 81, Dkt. No. 143-2).

## II.  APPLICABLE LEGAL PRINCIPLES

### A.  Summary Judgment Legal Standard

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Nicini v. Morra*, 212 F.3d 798, 805-806 (3d Cir. 2000) (en banc); *see also* Fed. R. Civ. P. 56(a).   "Once the moving party points to

---

[5]      Plaintiffs offer no evidence that they spoke to Jackson regarding Freeman's promotion.

evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).   A factual dispute is deemed genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which that party has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing the evidence, the court may not weigh the evidence and must give the nonmoving party the benefit of all reasonable inferences.   *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citations omitted); *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir. 1997). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).

### B.  Legal Standard for "Hybrid" Section 301 Claims

Plaintiffs' complaint alleges "hybrid" claims under section 301 of the Labor Management Relations Act, 29 U.S.C. §§ 159 and 185. (Complaint at ¶ 1, Dkt. No. 1).   "A hybrid section 301 action is one in which a union member sues his or her employer for breaching its contractual obligations under the collective bargaining agreement and the union for breaching the duty of fair representation." *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 236 (3d Cir. 1999) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-165 (1983)).   Section 301 claims are known as "hybrid" claims because they are "inextricably interdependent" in that "the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to

7

prevail on the breach of duty of fair representation claim against the union, and vice versa." *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993).  "Such a hybrid action really alleges that the process of collective bargaining has broken down." *Podobnik v. U.S. Postal Service*, 409 F.3d 584, 593 (3d Cir. 2005) (quoting *United Steelworkers v. Crown Cork & Seal Co.,* 32 F.3d 53, 58 (3d Cir. 1994)).

"A party seeking to recover on a hybrid § 301 claim against the employer must prove both that the employer violated the collective bargaining agreement and that the union breached its duty of fair representation." *Jones v. United Parcel Service, Inc*., 461 F.3d 982, 994 (8th Cir. 2006). Both halves of the hybrid claim must survive summary judgment in order for a hybrid claim to proceed to trial. Failure in one claim is fatal to the whole. *Pobodnik*, 409 F.3d at 593 (dismissing entire section 301 claim because the plaintiff failed to demonstrate question of material fact on his breach of contract claim); *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 631 (6th Cir. 2009) ("Both halves are essential."); *Nemsky v. ConocoPhillips Co.,* 574 F.3d 859, 864 (7th Cir. 2009) ("[N]either claim is viable if the other fails.") (citation omitted).

### C.  Interpretation of a Collective Bargaining Agreement

"Federal substantive law governs the meaning of collective bargaining agreements." *Sheet Metal Workers Local 19 v. Keystone Heating and Air Conditioning*, 934 F.2d 35, 40 (3d Cir. 1991).  "[W]here a court is called on to interpret a collective bargaining agreement it is generally appropriate for the court to look beyond the face of the collective bargaining agreement."  *Int'l Union, United Mine Workers of America v. Racho Trucking Co*., 897 F.2d 1248, 1254 (3d Cir. 1990) (quoting *Se. Pa. Transp. Auth. (SEPTA) v. Brotherhood of R.R. Signalmen*, 882 F.2d 778 (3d Cir.1989), *cert. denied*, 493 U.S. 1044 (1990)).  Indeed, as stated by the Supreme Court:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. *In order to interpret such an agreement it is necessary to consider . . . the practice, usage and custom pertaining to all such agreements.*

*Transp.-Commc'n Emps. Union v. Union Pac. R.R.*, 385 U.S. 157, 160-61 (1966) (emphasis added). "[C]ollective bargaining agreements commonly include implied terms and . . . the parties' practice is important in determining if the position of one of them is even arguably justified." *Racho Trucking Co*., 897 F.2d at 1254 (citing *Consolidated Rail Corp. (Conrail) v. Railway Labor Execs.' Ass'n*, 491 U.S. 299 (1989)).

"[T]he question of whether the terms of the collective bargaining contract are ambiguous is an issue of law." *Racho Trucking Co.,* 897 F.2d at 1252. "To decide whether a contract is ambiguous, [the court does] not simply determine whether, from [its] point of view, the language is clear. Rather, [the court] hear[s] the proffer of the parties and determine[s] if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Teamsters Indus. Empls. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) (quotations and brackets omitted). "*Before* making a finding concerning the existence or absence of ambiguity, [the court] consider[s] the contract language, the meanings suggested by counsel, and the *extrinsic evidence* offered in support of each interpretation . . . *Extrinsic evidence* may include the structure of the contract, the bargaining history, and *the conduct of the parties that reflects their understanding of the contract's meaning*." *Id*. (citations omitted) (emphasis added).

"Evidence of a course of conduct is particularly compelling when it occurs over a substantial time period." *Rolls-Royce,* 989 F.2d at 137. "[T]he practical interpretation of a

contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Id*. (quoting *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913)); *see also* Restatement (Second) of Contracts, § 202(4) (2012) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted and acquiesced in without objection is given great weight in the interpretation of the agreement.").

### D.  Duty of Fair Representation

A union has a duty under § 9(a) of the National Labor Relations Act ("NLRA") to fairly represent its members. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  A union breaches this duty of fair representation when its conduct toward an employee is "arbitrary, discriminatory, or in bad faith." *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67 (1991).[6]  A union's action are arbitrary only if, "in light of the factual and legal landscape at the time of the union's actions," the union's behavior is so far outside a "wide range of reasonableness" as to be "irrational." *O'Neill*, 499 U.S. at 78-79.  This is an "extremely deferential standard" that precludes courts from "substitut[ing] their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call."  *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir.1992).

A union "has broad discretion in its decision *whether and how* to pursue an employee's grievance against an employer." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567-68 (1990) (emphasis added); *see also Ayala v. Union de Tronquistas de Puerto*

---

[6]     In their opposition to HOVENSA's Motion for Summary Judgment, Plaintiffs argue only that the Union Defendants breached their duty of fair representation by *arbitrarily* refusing to pursue their grievance.  (Dkt. No. 142 at 20).

*Rico, Local 901*, 74 F.3d 344, 345-46 (1st Cir. 1996) ("A union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee.") (quotations omitted). "The mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious . . . Proof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of compliance with the [duty of] fair representation." *Findley v. Jones Motor Freight, Division Allegheny Corp.*, 639 F.2d 953, 958 (3d Cir. 1981) (citing *Vaca*, 386 U.S. at 192-93). "A union does not act arbitrarily simply because it does not pursue a grievance that it has decided lacks merit. This is true even if a judge or jury later determines that the grievance is meritorious. . . . A union owes a duty to all members of the bargaining unit, therefore the union has the affirmative duty not to press grievances which the union believes, in good faith, do not warrant such action." *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 847 (8th Cir. 2006) (internal citations and quotations omitted). To establish that a union acted arbitrarily in refusing to process a grievance, an employee must show that the decision is so unreasonable that it is "without rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998); *see Findley*, 639 F.2d at 961 (union processes grievance arbitrarily when it acts with "complete disregard in assessing the merits of [the] grievance").

"[A] union does not breach its duty of fair representation by rejecting an employee's interpretation of the collective bargaining agreement unless the union's interpretation is itself arbitrary or unreasonable." *Bache v. American Tel. & Tel.*, 840 F.2d 283, 291 (5th Cir. 1988); *see also Early v. Eastern Transfer*, 699 F.2d 552, 557 (1st Cir. 1983) (union did not violate its duty of fair representation before grievance committee when it "decline[d] to put forward an

11

interpretation of the collective bargaining agreement which [the] union reasonably believed was incorrect."); *Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 694 (7th Cir. 1982) (a union does not violate the duty of fair representation when it refuses to process a grievance based on its own reasonable interpretation of the CBA).

## III. <u>ANALYSIS</u>

As acknowledged by all parties in their summary judgment filings, and consistent with established law, Plaintiffs must be able to survive summary judgment on both halves of their section 301 claims—breach of contract *and* breach of duty of fair representation—in order to proceed to trial. *See Podobnik*, 409 F.3d at 593.  To survive summary judgment on their breach of the duty of fair representation claim, there must be a genuine issue  of material fact that the Union Defendants acted arbitrarily in not pursuing Plaintiffs' grievances regarding Williams' and Freeman's May 2008 promotions over Plaintiffs.  HOVENSA and the Union Defendants argue that the Union Defendants had a rational basis for determining that Plaintiffs' grievances lacked merit and that Plaintiffs cannot, therefore, show that the Union Defendants acted arbitrarily in not pursuing Plaintiffs' grievances. (HOV.'s MSJ at 11-15, Dkt. No. 116-1; Union Defs.' MSJ at 13-21, Dkt. No. 118-1).  After considering the evidence and arguments presented by the parties, the Court finds that there is no genuine issue of material fact on Plaintiffs' breach of duty of fair representation claim and that summary judgment in Defendants' favor is therefore warranted.

### A.  Plaintiffs' Grievance Regarding Williams' Promotion

The Union Defendants contend that their decision not to pursue Plaintiffs' grievance regarding Williams' "A" Operator promotion was grounded on their "reasonable" interpretation of the CBA that "continuous service" is measured from the date of the bid award, not the date

that an employee is certified in the position. (Union Defs.' MSJ at 20-21, Dkt. No. 118-1). The Union Defendants claim that this interpretation is reasonable in light of the language of the CBA and the established course of conduct between the Unions and HOVENSA. *Id*.

The parties acknowledge that Article 16 of the CBA governs promotion from one Operator level to the next. (Plts.' Opp. to HOV.'s MSJ at 1-2, Dkt. No. 142; UDSOF at ¶ 8; PRUDSOF at ¶ 8).  Their dispute concerns the interpretation of sections 16.2, 16.4 and 16.6 of the CBA.

Section 16.2 provides in pertinent part:

In all cases of promotion within the department, the following factors shall be considered . . .

1.  *Continuous service in the next lower job classification* . . . ;

2.  Ability to perform the work;

3.  Physical fitness;

4.  Absenteeism and tardiness.

When it is determined that factors 2 . . . 3 . . . and 4 are relatively equal, then length of continuous service in the next lower job classification shall govern.

(CBA § 16.2).  Section 16.4 provides in pertinent part: "If two (2) or more employees are qualified pursuant to Article 16.2 and are equal in seniority, then continuous service in the next lower job classification shall govern."  (CBA § 16.4).  Finally, section 16.6 states:

The successful bidder will be given a training period of ninety (90) calendar days to qualify for the job.  During the training period the successful bidder will be compensated at the rate of pay that he was receiving at the time that he was selected as the successful bidder.  (The successful bidder shall not receive the rate of pay of the higher position until he is certified to perform the job). If the employee fails to demonstrate to the satisfaction of the Company that he can handle the job, than he shall revert to his former lower classification without loss of seniority in that classification.  Further, if during the training period it is apparent that an employee cannot qualify for the job he shall be returned to his prior classification.  An employee may also voluntarily elect to revert to his

former classification without loss of seniority if he does so within (30) after being installed on the job.

(CBA § 16.6).

The Union Defendants and HOVENSA contend that "continuous service in the next lower job classification," referred to in sections 16.2 and 16.4 of the CBA, is measured from the day that the employee is *awarded* a bid in the "next lower job classification," not when the employee completes his or her training and is *certified* for the particular position.  (HOV.'s Br. at 10-11, Dkt. No. 116-1; Union Defs.' Br. at 10-11, Dkt. No. 118-1; *see also* Jackson Dep. at 82-83, Dkt. No. 143-2; Boulanger Dep. at 135, Dkt. No. 119-4). Under this interpretation, Defendants maintain that awarding Williams an "A" Operator position over Plaintiffs in May 2008 was not a breach of the CBA, because Williams had been awarded a "B" Operator bid in *September 2006*, while Plaintiffs had been awarded "B" Operator bids in *April 2007*.  (HOV.'s Br. at 10-11, Dkt. No. 116-1; Union Defs.' Br. at 10-11, Dkt. No. 118-1).  Accordingly, they assert that the Union Defendants had a reasonable basis for not pursuing Plaintiffs' grievance regarding Williams' promotion.

Plaintiffs argue that, notwithstanding HOVENSA and the Union Defendants' contention that "continuous service" under sections 16.2 and 16.4 begins on the date of the bid award, "the clear, unambiguous language of the CBA is that 'continuous service' cannot begin until the employee who wins the bid is certified for the position and begins 'service' in that position." (Plts.' Opp. to HOV.'s MSJ at 13, Dkt. No. 142). Plaintiffs further contend that Williams could not have had more "continuous service" than Plaintiffs, because "it is undisputed that Williams did not accept the [2006] bid and rejected it." *Id.* at 4.

After reviewing the evidence presented by the parties, the Court finds that neither of Plaintiffs' contentions has merit.  First, contrary to Plaintiffs' claim, sections 16.2, 16.4 and 16.6,

when read together, do not "unambiguously" provide that "continuous service" begins to run when an employee is trained and certified in a new position. Neither these sections, nor any other provision in the CBA that the parties have brought to the Court's attention, define the phrase "continuous service in the next lower job classification."[7]

Further, Plaintiffs' arguments that specific provisions in section 16.6 demonstrate the correctness of their proffered interpretation are unpersuasive. Plaintiffs argue that their interpretation of the contested provisions of the CBA—that "continuous service" begins only after certification in the new position—is supported by the portion of section 16.6, which states that "the successful bidder shall not receive the rate of pay of the higher position until he is certified to perform that job," because "if the worker is not being paid for the higher-level job, he should not be considered to have begun that job for continuous service measuring purposes." (Plts.' Opp. to HOV.'s MSJ at 14-15, Dkt. No. 142). Plaintiffs also argue that because section 16.6 provides a 90-day period to "qualify for the job," continuous service cannot begin until the employee is certified in his new position. *Id*. at 15. Finally, Plaintiffs contend that the language in section 16.6—which states that an employee who is unsuccessful in demonstrating that he can "handle the job" does not lose his seniority in his or her "former lower classification"—indicates that an employee does not receive "seniority at the higher level . . . until certification." *Id*.

However, section 16.6 does not define "continuous service in the next lower job classification," nor does the language of the section necessarily imply the meaning that Plaintiffs

---

[7]     Although Plaintiffs do not purport to include the time of bid award as a possible interpretation, Plaintiffs appear to argue that the language of the CBA is ambiguous when they state, in their response to the Union Defendants' SOF, "that the CBA Section 16.4 is *ambiguous* and that "continuous service" can be calculated from the time an employee completes his 90 day training and qualifies through certification for the new position . . . . The CBA *does not state expressly how to determine the beginning date for determining when continuous service at a given level begins* . . ." (PRUSDSOF at ¶ 31) (emphasis added).

suggest.   As a preliminary matter, the three references in section 16.6 to "revert[ing]" or "return[ing]" to the "lower," "prior," or "former" classification suggest that, upon bid award, the status of the successful bidder is converted to the higher classification. Moreover, the language of section 16.6 which states that "[i]f the employee fails to *demonstrate to the satisfaction of the Company* that he can handle the job, than he shall revert to his former lower classification without loss of seniority in that classification," suggests that a successful bidder is returned to his lower classification *only if, and after* HOVENSA affirmatively determines that the employee has failed to demonstrate that he can "handle the job." (CBA § 16.6) (emphasis added).  This is further supported by Union President Jackson who testified that an employee is entitled to the seniority which accompanies a promotion—even if the employee is never certified in that position—unless HOVENSA "take[s] it back from you."  (Jackson Dep. at 86, Dkt. No. 143-2). Finally, unlike with the rate of pay of the higher position, there is no indication that seniority is tied to the successful bidder's certification to perform the new job.  Indeed, while Plaintiffs seek to tie "continuous service"—and thus seniority—to certification for the new position and the beginning of service in that position (Plts' Opp. to Hov.'s MSJ at 13, Dkt. No. 142), the language of section 16.2 refers to service in the "job classification."

Accordingly, at least one other possible interpretation of the relevant provisions exists. Thus, Plaintiffs' arguments suggest, at best, that the *language* of the CBA may be ambiguous concerning how "continuous service" is measured for purposes of sections 16.2 and 16.4. However, as discussed above, interpretation of a collective bargaining agreement is more than just an analysis of its language; it requires the Court to "look beyond the face of the collective bargaining agreement," and consider the "practice, usage and custom pertaining" to the terms of the CBA.  *Transp.-Commc'n Emps. Union,* 385 U.S. at 160-61; *Racho Trucking Co.*, 897 F.2d at

16

1254.   In determining *whether* there is an ambiguity, the Court is required to "consider the contract language, the meanings suggested by counsel, *and the extrinsic evidence offered in support of each interpretation . . .* includ[ing] the structure of the contract, *the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.*" *Rolls-Royce,* 989 F.2d at 135 (emphasis added).

Here, the evidence shows that the contracting parties to the CBA—HOVENSA and the Union Defendants—both interpret the CBA such that "continuous service," for the purposes of sections 16.2 and 16.4 of the CBA, begins when an employee receives a bid award, not when that employee is certified in that position. (Jackson Dep. at 82-83, Dkt. No. 143-2; Boulanger Dep. at 50, Dkt. No. 143-7).   Even more importantly, the contracting parties have produced testimonial evidence that this has, in fact, been the practice of HOVENSA and the Union Defendants since at least 1979. (Jackson Dep. at 85, Dkt. No. 143-2; Boulanger Dep. at 136, Dkt. No. 119-4).   Union President Jackson, who testified that he has been involved in the management of Defendant Local 8526 since 1979, stated that it has "always been" the policy of the Unions and HOVENSA that seniority starts to accrue on the date of the bid award.   (Jackson Dep. at 85, Dkt. No. 143-2).   HOVENSA's Vice President of Human Resources, John Boulanger, confirmed this policy and testified that he was unable to find anyone at HOVENSA who knew of an award that was not made in conformity with this policy.   (Boulanger Dep. at 136, Dkt. No. 119-4). Thus, Plaintiffs' claim that "neither Defendant has presented any evidence whatsoever that there is such a past practice" (Plts.' Opp. to HOV.'s MSJ at 4, Dkt. No. 142), simply ignores this uncontradicted testimony.

The evidence also shows that the 90-day training period set forth in section 16.6 is routinely extended by HOVENSA, sometimes for years. (Jackson Dep. at 128-131, Dkt. No.

143-2 (employees went as many as "three or four years" before being trained and certified);[8] Paul Dep. at 28, Dkt. No. 143-6 (training for operator positions in the refinery was not completed within 90 days)).  Plaintiffs' reliance on an allegedly strict ninety-day deadline for training and certifying employees as support for the proposition that the CBA unambiguously requires that seniority is determined by the date of certification is belied by the actual practices of HOVENSA and the Union Defendants, and is thus unavailing.   Moreover, the evidence shows that HOVENSA and the Union Defendants had a policy of using the bid award date to determine seniority out of concerns for fairness to employees—because the delays in training and certification are frequently due to events beyond the control of the employees such as "special assignments," manpower requirements and illness. (Jackson Dep. at 87, Dkt. No. 143-2; Paul Dep. at 28, Dkt. No. 143-6; Boulanger Dep. at 135, Dkt. No. 119-4).[9]

---

[8]     Jackson testified that at least three HOVENSA employees—Bojo Wells, Williams Massiah, and Mr. Milligan—went years before they were trained and certified in their new positions because of delays on HOVENSA's part, and received a backpay check when they were finally certified.  (Jackson Dep. at 128-131, Dkt. No. 143-2).

[9]     Boulanger testified that HOVENSA "use[s] bid date for promotions and not [the] certification date [because] . . . lots of factors . . . can enter into the certification process.  Some of those are business needs, some of those are illness.  So two people who may receive a bid on the same date may have different certification dates, and our past practice is that the fairest date to use is the one with the least amount of variables to ensure fairness."  (Boulanger Dep. at 135, Dkt. No. 119-4).

        Union President Jackson testified that the 90-day training process can be extended "because of manpower, scheduling, and stuff like that . . . when you do get certified, the company will pay you retroactive back pay to the 91st day from the time you [were] supposed to get the bid."  (Jackson Dep. at 87, Dkt. No. 143-2). Urban Paul, an assistant manager in the East Powerhouse, similarly testified that the 90-day period can be extended for a "myriad . . . of situations from being on special assignment and the company needing you to complete that before you do the testing.  If an employee was out sick for some reason, or any combination."  (Paul Dep. at 28, Dkt. No. 143-6).

Thus, Defendants have offered evidence that HOVENSA and the Union Defendants have an established practice of interpreting the CBA such that "continuous service in the next lower job classification," for purposes of sections 16.2 and 16.4, begins when an employee receives a bid award, not when the employee is ultimately certified in that position.  Plaintiffs, on the other hand, have offered no evidence to either contradict this longstanding policy or to create a genuine issue of material fact as to the existence of such a policy.[10]

As discussed above, "a union does not breach its duty of fair representation by rejecting an employee's interpretation of the collective bargaining agreement unless the union's interpretation is itself arbitrary or unreasonable." *Bache*, 840 F.2d at 291; *see also O'Neill*, 499 U.S. at 78-79 (union conduct violates duty of fair representation if "arbitrary" or "irrational). The Union Defendants have presented evidence that their interpretation of the CBA is based on a longstanding course of conduct between HOVENSA and the Union Defendants of using the date

---

[10]     On May 30, 2012, eight days after the Plaintiffs' twice-extended deadline for the filing of its Oppositions to Defendants' Motions for Summary Judgment (*see* Dkt. Nos. 121 and 141), Plaintiffs filed a "Notice of Additional Evidence Pursuant to Rule 26," in which they contend that, during a February 2011 Union meeting wherein the members of the Union ratified the latest version of the CBA, Jackson took the position that "continuous service" begins when an employee is certified.  (*See* Dkt. No. 151 at 2).  On motion of the Defendants, the Court struck this document and Plaintiffs' "Supplemental Interrogatory Response," filed on July 2, 2012 (see Dkt. No. 185-2), which contained a similar factual contention, on the grounds that the filings violated Federal Rule of Civil Procedures 5(d), Local Rule of Civil Procedure 26.1, and were an improper and untimely supplement to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment. (*See* Dkt. No. 254). In any event, the collective bargaining agreement at issue in *this* case was in effect from March 7, 2007 through February 29, 2011. (UDSOF ¶ 4; PRUDSOF ¶ 4).  Extrinsic evidence concerning an agreement that was ratified four years after the one at issue in this case is irrelevant and would not aid Plaintiffs' cause. *See Rolls-Royce,* 989 F.2d at 137 (extrinsic evidence is relevant when it "shed[s] light on the contracting parties' intention *when they signed the ambiguous collective bargaining agreement*.") (emphasis added); *see also Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*,  475 F.3d 805, 815 (6th Cir. 2007) ("[F]or extrinsic evidence to be relevant, it must relate to the formation of the contract . . . Thus, even where an ambiguity exists, extrinsic evidence must shed some light on the circumstances surrounding the contract formation in order to be admissible.") (citations omitted).

of a bid award to determine seniority, and considerations of fairness to employees for whom training and certification in a position may be delayed for reasons beyond their control. (Jackson Dep. at 82-83, 85, 128-131, Dkt. No. 143-2; Boulanger Dep. at 50, 135-136, Dkt. No. 119-4; Paul Dep. at 28, Dkt. No. 143-6).[11]   Based on the language of the CBA, the course of conduct of HOVENSA and the Union Defendants, and the underlying considerations of fairness which motivated that course of conduct, the Court finds that no reasonable jury could find that the Union Defendants' interpretation of the CBA was "irrational," "arbitrary," or "without rational basis or explanation." *Bache*, 840 F.2d at 291; *O'Neill*, 499 U.S. at 78-79; *Marquez*, 525 U.S. at 44.

Moreover, "[i]n the context of interpreting provisions of a CBA, a court may find that a union's interpretation of the provision was reasonable as a matter of law, even if the court disagrees with the interpretation reached by the union, so long as the unions actions were not 'so far outside a wide range of reasonableness as to constitute irrational or arbitrary conduct.'" *Musto v. Transport Workers Union of America, AFL-CIO*, 818 F. Supp. 2d 621, 635 (E.D.N.Y. 2011) (quoting *Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575*, 983 F.2d 325, 330 (1st Cir. 1992)). Consistent with that principle, even if the Court were to disagree with the Union Defendants' interpretation of the CBA in this matter, their interpretation of the CBA is based on rational justifications—a longstanding course of conduct and fairness to its members—and is thus well within the "wide range of reasonableness" afforded to unions. *Bache*, 840 F.2d at 291;

---

[11]    The Union Defendants are justified in considering the interests of its other members in deciding not to pursue the grievances of individual employees. *See Ayala*, 74 F.3d at 345-46 ("A union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee."); *Findley*, 639 F.2d at 958 ("In processing grievances there are times when the interests of all the employees affected by given circumstance may not be harmonious.").

*Early,* 699 F.2d at 557; *Findley,* 639 F.2d at 958; *see also Chaparro-Febus,* 983 F.2d at 330 ("Even if we disagreed with the interpretation-which we do not-we would still be compelled to affirm the district court's grant of summary judgment as the union's actions were plainly not "so far outside a 'wide range of reasonableness'" as to constitute irrational or arbitrary conduct.") (quoting *O'Neill,* 499 U.S. at 78-79)); *Musto,* 818 F. Supp. 2d at 635.

Finally, there was a reasonable basis for rejecting any contention by Plaintiffs that Williams "rejected" the 2006 "B" Operator promotion.[12]  Plaintiffs base this contention on: 1) the deposition testimony of Cyril Moses, who testified that Williams stated that he "prefer[ed] to stay in the east;" and that there was no specific manpower hardship of which he was aware that would have prevented Williams from being transferred to the West Powerhouse to begin his training, (Moses Dep. at 12, 14, Dkt. No. 145-6); and 2) the evidence demonstrating that Williams did not train for the "B" Operator position or go to work as a "B" Operator at the West Powerhouse.  (Williams Dep. at 41, Dkt. No. 145-3).

Assuming that this was part of Plaintiffs' "grievance," there was justification for rejecting this contention. Although it is undisputed that Williams did not train to be a "B" Operator until after he was awarded the "A" Operator bid, there is no evidence that this was because he "rejected" the "B" Operator bid award.  To the contrary, Williams himself testified that he inquired of several people about beginning his "B" Operator training and was told that, as long as he did not reject the bid, he would not lose his seniority, and would receive backpay once he

---

[12]   The record does not indicate that Plaintiffs voiced their contention—argued before this Court—that Williams "rejected" his "B" Operator promotion to the Union Defendants as part of their "grievance."  The Court will nonetheless address this contention, as if it had been so raised by Plaintiffs.

completed his training.[13]   He further explained that this is why he did not voice any written

objection to not receiving his "B" Operator training.  (Williams Dep. at 41-51, Dkt. No. 145-3).

When asked if Williams refused to "go to the west," Moses testified that Williams "never told

me that he won't go to the west."  (Moses Dep. at 19, Dkt. No. 145-6).  Moses also testified that

it was up to Tang Yuk, who was "in charge of the west," to request that Williams be released to

go for his training.  *Id*. at 13, 18-19.[14]   Thus, Moses' testimony that Williams "preferred" to stay

"in the east," and that there was no manpower shortage that prevented Williams from being

transferred, together with the fact that Williams never trained or certified to be a "B" Operator

until after he received his "A" Operator promotion, does not create a genuine issue of material

fact as to the reasonableness of a determination not to pursue Plaintiffs' grievance regarding

Williams' promotion.

Accordingly, because the Union Defendants have demonstrated that there is no genuine

issue of material fact that they had a reasonable basis for refusing to pursue Plaintiffs' grievance

regarding William's "A" Operator promotion, the Union Defendants and HOVENSA are entitled

to summary judgment on that aspect of Plaintiffs' claims.

### B.  Plaintiffs' Grievance Regarding Freeman's Promotion

According to Plaintiffs, in June 2008, they complained to a Union Representative that

Freeman should not have been treated as "senior" to them for purposes of the May 2008 "A"

---

[13]     Further, Williams testified that he was informed by Union personnel that if he wanted to
reject the position, he would have to put his rejection in writing.  (Williams Dep. at 41, Dkt. No.
145-3).  The record contains no evidence of such a written rejection.

[14]     Moses' testimony that there was no specific manpower hardship of which he was aware
that prevented Williams from transferring to the West Powerhouse does not create a genuine
issue of material fact that Williams "rejected" the position.  According to the testimony of
Jackson, Boulanger and Paul, manpower shortages were only one of *several* reasons for why
HOVENSA extends the ninety-day training period.   (Jackson Dep. at 87, Dkt. No. 143-2;
Boulanger Dep. at 135, Dkt. No. 119-4; Paul Dep. at 28, Dkt. No. 143-6).

Operator promotion because the "B" Operator position that Freeman was awarded on October 2, 2006, had not been posted in accordance with the CBA.  (*See* H. Figueroa Dep. at 38-40, Dkt. No. 119-9).  Plaintiffs allege that the Union Defendants breached their duty of fair representation by not pursuing this grievance against HOVENSA. (Complaint ¶ 16, Dkt. No. 1; *see also* Plt.s' Opp. to MSJ at 14, Dkt. No. 144).

Defendants have presented undisputed evidence that, on July 24, 2006, two "B" Operator openings, designated "06-24," were posted by HOVENSA. (HSOF at ¶ 11; PRHSOF at ¶ 11; *see also* Bid Notice, Dkt. No. 115-6 at 1; Freeman Dep. at 4, Dkt. No. 119-6).  Eleven HOVENSA employees, including Peter Williams and Eugene Freeman, applied for the positions.  (HSOF at ¶ 11; PRHSOF at ¶ 11; *see also* Bid Forms, Dkt. Nos. 115-6 at 4-14).[15]  Freeman applied for the "06-24" "B" Operator position on July 26, 2006.  (*See* Bid Form, Dkt. No. 115-6 at 14).[16]  The documentary evidence shows that on or about October 2, 2006, Freeman was awarded one of those two "06-24" "B" Operator positions.  (*See* Bid Award, Dkt. No. 115-6 at 3; Freeman Dep. at 25-26, Dkt. No. 119-6; Jackson Dep. at 104, Dkt. No. 143-2).   Thus, this evidence demonstrates that the "B" Operator position ultimately awarded to Freeman was posted on July 24, 2006.[17]  Accordingly, the Union Defendants have shown that they had a reasonable

---

[15]     Plaintiffs did not apply for the "06-24" "B" Operator positions. (*See* Bid Forms, Dkt. Nos. 115-6 at 4-14).

[16]     While Freeman could not recall the exact date that he submitted the bid, he did confirm that the Bid Form, dated July 26, 2006, (Dkt. No. 115-6 at 14), was the one that he submitted. (Freeman Dep. at 5-6, 25-26, Dkt. No. 119-6).

[17]     Based on the testimony of Williams, who stated that he did not recall seeing Freeman's "B" Operator bid award at "roughly" the same time that he received his own bid award (*see* Williams Depo at 36-38), Plaintiffs attempt to create an issue of material fact that the "B" Operator position awarded to Freeman was never posted. (Plts.' Opp. to HOV.'s MSJ at 6, Dkt. No. 142).  As discussed above, however, the documentary evidence demonstrates that the bid awarded to Freeman on October 2, 2006, was posted on July 24, 2006.  That Williams did not

justification for determining that Plaintiffs' allegations regarding Freeman were meritless, and therefore not a proper basis for a grievance against HOVENSA. *Cross,* 450 F.3d at 847; *Findley*, 639 F.2d at 958.

Additionally, section 24.3 of the CBA provides that "[a]ll complaints, disputes or grievances from any employees . . . . shall be submitted by the Union representative to the employee's . . . immediate supervisor. . . . within one hundred and twenty (120) *hours* after the occurrence of the event about which the complaint is made." (CBA § 24.3) (emphasis added). The evidence shows that Plaintiffs did not bring their concerns regarding Freeman's "B" Operator promotion to the Union Defendants until sometime in June 2008, which is nearly *twenty months* after Freeman was awarded the "B" Operator position. (Acosta Dep. at 34-35, 49, Dkt. No. 145-2).  Plaintiffs were thus well beyond the time period within which the Union Defendants could have brought a grievance for the alleged failure to post the "B" Operator bid awarded to Freeman under the terms of the CBA.  (*See* CBA § 24.3).[18] Plaintiffs' failure to timely approach the Union Defendants with their challenge to Freeman's "B" Operator promotion provides an additional justification for the Union Defendants' refusal to pursue Plaintiffs' grievance. *See Hubicki v. ACF Industries, Inc.,* 484 F.2d 519, 525 (3d Cir. 1973) (holding that the "union's refusal to process plaintiff's grievance was reasonable or in good faith

---

see Freeman's October 2, 2006 Bid Award when he was awarded his own "B" Operator promotion on September 13, 2006—even when considered in the light most favorable to Plaintiffs—does not create a *genuine* issue of material fact as to whether the position awarded to Freeman on October 2, 2006 was posted on July 24, 2006. *See Bruesewitz v. Wyeth Inc*., 561 F.3d 233, 253-54 (3d Cir. 2009) ("The 'mere existence of a scintilla of evidence' in support of the nonmoving party's claim is insufficient" to create "a genuine issue of material fact") (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)).

[18]    In their Motions for Summary Judgment, Defendants argued that Plaintiffs' grievance regarding Freeman was untimely under section 24.3 of the CBA.  (Union Defs.' MSJ at 9, Dkt. No. 118-1; HOV.'s MSJ at 11, Dkt. No. 116-1).  Plaintiffs did not address this argument.

since [plaintiff] admittedly did not request it to do so within thirty days of his termination by ACF" as required by the CBA).[19]

Because the Union Defendants have demonstrated that there is no genuine issue of material fact that they had a reasonable basis for refusing to pursue Plaintiffs' grievance against HOVENSA regarding Freeman's "A" Operator promotion, the Union Defendants are entitled to summary judgment on that aspect of Plaintiffs' claims.

### C. Failure to Investigate Plaintiffs' Allegations

Plaintiffs further argue that the Union Defendants acted arbitrarily in not performing an investigation regarding Williams' or Freeman's "B" Operator status before deciding not to pursue their grievances. "Although it is true that the union's duty requires some minimal investigation into a member's grievance, only an investigation that reflects an egregious disregard for union members' rights constitutes a breach of the union's duty." *Truhlar v. U.S. Postal Service*, 600 F.3d 888, 893 (7th Cir. 2010) (quotations omitted). Such is not the case here.

---

[19]     In their Opposition to Defendants' Motions for Summary Judgment, Plaintiffs argue—for the first time—that Freeman should not be deemed more senior to them because his October 2, 2006 "B" Operator promotion was awarded more than thirty days after it was posted, purportedly in violation of section 16.3 of the CBA, which states in pertinent part that "[a]ll such permanent vacancies that the Company intends to fill . . . will be filled within thirty (30) days after the posting . . ." (CBA § 16.3). In response, Defendants argue that this contention lacks merit because, *inter alia*, it was not raised in a grievance within the time required by the CBA.  (Union Defs.' Reply Br. at 7, Dkt. No. 153; HOV.'s Reply Br. at 8, Dkt. No. 154). As discussed above, an employee is required to bring a grievance to a union representative within 120 hours of an alleged violation.  Assuming that this contention was raised in the context of Plaintiffs' June 2008 complaint to Jackson and Figueroa—which, as noted above, does not appear to be the case—it  would have nonetheless been approximately twenty months late.  As such, Plaintiffs' attempt to parlay the alleged 2006 violation of the thirty-day provision into their claim that Freeman's 2008 "A" Operator promotion violated the CBA must fail.

Jackson's understanding of the CBA was that "continuous service in the next lower job classification" is measured when an employee is awarded a bid, not when the employee is certified.  (Jackson Dep. at 85, Dkt. No. 143-2).  Plaintiffs do not contest the *date* of Williams' and Freeman's "B" Operator awards—July and October of 2006; rather they allege that Williams and Freeman should not be treated as more senior than Plaintiffs because Williams never trained or certified as a "B" Operator prior to his promotion to "A" Operator,[20] and the "B" Operator bid awarded to Freeman was never posted. (PRUDSOF at ¶¶ 15-16).  Indeed, at the time that the contested "A" Operator positions were awarded, HOVENSA's Quarterly Seniority Listing reflected that Freeman and Williams had been awarded "B" Operator bids prior to Plaintiffs. (Dkt. No. 119-6 at 13-19).  Thus, because there was no controversy regarding when Williams and Freeman were awarded their "B" Operator bids, and because Jackson reasonably believed that, under the CBA, the date of the bid award determines seniority for the purposes of promotions, there was no reason for him to further investigate the matter.  *See Rupe,* 679 F.2d at 694 (holding that union president did not violate duty of fair representation by not investigating plaintiff's grievance when the union president "simply was not apprised of any facts or contentions that warranted further investigation.").

In any event, after a full period of discovery, Plaintiffs have failed to produce any evidence that an investigation by the Union Defendants would have uncovered information

---

[20]    Union President Jackson testified that a few months after Williams had been awarded the October 2, 2006 "B" Operator bid, he learned from Calvin Yorke, a union steward, that the period for Williams' certification had been delayed because Williams was doing special assignments in the Utilities and Power section, including the training of other Operators. (Jackson Dep. at 90-91, Dkt. No. 143-2). According to the evidence presented, it is precisely such circumstances beyond the control of employees that prompted use of the bid award date to determine seniority.  (Jackson Dep. at 87, Dkt. No. 143-2; Paul Dep. at 28, Dkt. No. 143-6; Boulanger Dep. at 135, Dkt. No. 119-4).

undermining the reasonableness of their decision not to pursue grievances against HOVENSA. Accordingly, their argument that the Union Defendants failed to sufficiently investigate their grievances is of no moment.  *See Evangelista v. Inlandboatmen's Union of Pacific*, 777 F.2d 1390, 1395-96 (9th Cir. 1985) ("[E]xtensive investigation by a union is unnecessary where it would not have resulted in the development of additional evidence which would have altered the union's decision not to pursue the grievance."); *see also Findley*, 639 F.2d at 959 (when breach of duty of fair representation is based on an alleged omission by the union, plaintiff must demonstrate that he was "damaged" by the alleged omission).

Based on the foregoing, the Court concludes that the Union Defendants were within their discretion in not conducting a further investigation before deciding not to pursue Plaintiffs' grievances against HOVENSA.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court concludes that there is no genuine issue of material fact regarding the breach of duty of fair representation prong of Plaintiffs' hybrid section 301 claims against HOVENSA and the Union Defendants.[21]   Accordingly, Defendants are entitled to summary judgment on all of Plaintiffs' hybrid section 301 claims.  *Pobodnik*, 409 F.3d at 593.  Plaintiffs' complaint must therefore be dismissed with prejudice.  An appropriate Order and Judgment accompanies this Memorandum Opinion.


Date: September 7, 2012                                   _____/s/_____
                                                         WILMA A. LEWIS
                                                         District Judge

---

[21]     Because Plaintiffs cannot survive summary judgment on their alleged breach of duty of fair representation claim, the Court need not address the alleged breach of contract prong of the hybrid section 301 claim.  *See Pobodnik*, 409 F.3d at 593 (Plaintiffs must survive summary judgment on both halves of the section 301 claims to proceed to trial).